UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In Re:  
DAVID JOHN ANTON and  
DEBORAH ANTON,

    Debtors
_____/

Case No. 08-64144  
Chapter 7  
Hon. Walter Shapero

MICHAEL GIDELSKI, SR., Conservator of  
Hattie A. Gidelski, and HATTIE A.  
GIDELSKI, jointly & severally,

    Plaintiffs,

v.

DAVID JOHN ANTON and DEBORAH  
ANTON, jointly & severally,

    Defendants
_____/

Adv. Pro. No. 09-04344

## OPINION REGARDING PLAINTIFF'S ACTION FOR NONDISCHARGEABILITY

### INTRODUCTION

    A husband and wife filed this joint Chapter 7 bankruptcy. Plaintiff brought this adversary proceeding for nondischargeability against both co-debtors. The Court granted partial summary judgment against Defendant based primarily upon her guilty plea in a state court criminal proceeding. As to the husband, the Court finds in his favor.

### BACKGROUND

    Joint debtors filed this Chapter 7 bankruptcy in 2008. Hattie A. Gidelski ("Ms. Gidelski") by way of her son and conservator Michael Gidelski, Sr. ("Plaintiff"), alleged that Ms. Gidelski's

1

daughter, Defendant Deborah Anton ("Mrs. Anton") wrongfully took funds properly belonging to Ms. Gidelski, specifically by improperly withdrawing funds from joint accounts, improperly borrowing money in Ms. Gidelski's name and converting it, misusing the power of attorney and conservatorship granted to her by Ms. Gidelski, and a variety of other acts incident thereto (hereinafter, the "Scheme"). The Debtors did not name Ms. Gidelski as a creditor in their schedules. In February 2009, Plaintiff brought this adversary proceeding for nondischargeability under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6) against Mrs. Anton, jointly and severally with her husband, David John Anton ("Mr. Anton"). During the course of the litigation, Ms. Gidelski died and Plaintiff (who is her son and the brother of Mrs. Anton) continued the suit as the representative of the estate.

Criminal charges were brought in state court against Mrs. Anton and, in August 2009, she pled guilty to the crime of Larceny Between $200 and $1,000. The state court sentenced Mrs. Anton to 30 days of incarceration and ordered her to pay $200,000 in restitution, together with fines and costs of $655. On the basis of Mrs. Anton's guilty plea, this Court granted Plaintiff partial summary judgment as to the liability of Mrs. Anton, solely under the § 523(a)(4) count. Plaintiff claims the sums taken were higher than $200,000. Nothing in the record indicates that Mr. Anton was also subject to a criminal investigation or prosecution. Plaintiff alleges that Mr. Anton either actively participated in Mrs. Anton's Scheme, knew of it, or should have known of it and questioned the source of the money that his wife deposited into the household accounts and that he used. Plaintiff also pursued treble damages, pursuant to Michigan's statutory conversion law. The Court denied Plaintiff's motion for partial summary judgment as to Mr. Anton's liability and held a trial on the issues of whether he became obligated to Plaintiff, whether any obligation was nondischargeable, and the amount of any such obligation.

2

Mr. and Mrs. Anton testified that Mrs. Anton took the almost exclusive responsibility of managing the Debtors' finances. The couple agreed to this arrangement, which was necessitated by the fact that Mr. Anton's employment as an engineer caused him to travel to various cities around the US and Canada for a minimum of two weeks per month. The couple shared at least two joint bank accounts. His business travel expenses were charged to an American Express account that Mrs. Anton paid, as with most, if not all, other household obligations.

Mr. Anton testified that he rarely viewed any bank statements or other financial documents and trusted his wife's judgment in such matters. For example, he testified that he signed the joint income tax filings prepared by his wife without reviewing them (the tax filings did not reflect any misappropriated funds). Mr. Anton testified that his ignorance as to the couple's financial affairs ended around July 2008 when he was laid off from his job and, upon his wife's declaration that they were deeply indebted, met with an attorney the following month to explore the option of declaring bankruptcy. Mr. Anton testified that it was then that he first learned of his wife's Scheme and misappropriations from Ms. Gidelski. His awareness was punctuated when Plaintiff's wife levied accusations of theft and the police later visited the couple's home in October 2008.

Mrs. Anton was not employed from 2004-2007. During those years, Mr. Anton had incomes of $81,871, $69,319, $85,000, and $87,128, respectively. Mrs. Anton paid the couple's various financial obligations, including the mortgage on the couple's home (which they owned as tenants by the entirety), household bills, vehicle costs, credit card bills, private school tuition for their children, and home improvement work on the basement. This home improvement began around the year 2006, took several months to complete, and cost approximately $35,000 to

3

$40,000. Mrs. Anton took the sole responsibility for finding the contractor and paying for the work.

## DISCUSSION

### I. The Existence of a Debt

Nondischargeability actions under § 523 require the initial existence of a "debt" owed by the defendant to the plaintiff. In re Eisaman, 387 B.R. 219, 224 (Bankr. N.D. Ind. 2008)(nondischargeability action dismissed because, under relevant state law, the statute of limitations invalidated the cause of action allegedly creating the debt). As stated by another bankruptcy court:

> The Code defines a "debt" as "liability on a claim." 11 U.S.C. § 101(12). The United States Supreme Court has indicated that the meanings of "debt" and "claim" are coextensive. Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). In turn, the Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(A). Finally, the Supreme Court has interpreted "right to payment" to mean "nothing more nor less than an enforceable obligation." Id. at 559, 110 S.Ct. at 2131; see also In re Long, 148 B.R. 904, 908 (Bankr. W.D. Mo.1992).

In re Wilder, 178 B.R. 174, 176 (Bankr. E.D. Mo. 1995)(footnote omitted). The statutory scheme under § 523 is an inquiry, given the existence of the debt in the first place, as to whether or not that debt can be found nondischargeable. If there is no debt, the inquiry is at an end. In most cases, the existence of the required debt is not an issue and is more or less a given.

In this case, the parties did not initially or separately deal with that question in any material way, except inferentially to the extent the elements of nondischargeability overlap those determining the existence of a debt in the first place. For instance, at trial, the Court sought to clarify Plaintiff's statement of the issues as to Mr. Anton's liability as follows: "First, you

4

believe there is liability here on his part. Second, you believe there is a liability that's nondischargeable. And thirdly, you believe the amount of the nondischargeable liability – if we get that far – is X dollars." Plaintiff's attorney agreed with the Court's characterization of the issues, implying that the establishment of a liability in the first place is necessary to the Court's ruling on nondischargeability. However, the bulk of the testimony and arguments by both parties focused on the nondischargeability aspect and largely assumed the existence of a debt.

It was not argued that Mr. Anton became personally liable on his wife's criminal restitution debt, by operation of law or otherwise. Indeed the Court is persuaded that a criminal restitution debt incurred by one person does not perforce also apply to an innocent spouse. One court supported the view that one spouse's criminal restitution debt could not be transferred to her innocent spouse, though the liability was incurred during the marriage. Thompson v. Thompson, 105 P3d 346, 352-52 (Okla. Civ. App. 2004). In an unpublished opinion, the Michigan Appeals Court supported this view, calling the idea of holding the innocent spouse automatically liable "illogical and unreasonable." League v. League, 2006 WL 2987570 (Mich. Ct. App. 2006)(quoting Thompson with approval). The Court is persuaded by these two cases and their reasoning.

In this case, what we have as of the time of the bankruptcy filing is a restitution obligation of Mrs. Anton (and solely against her) arising in a state court criminal proceeding. There has been no state court civil judgment against her or against her husband. No proof of claim was filed by Plaintiff against either Defendant. The fact that the spouse was not part of the criminal activity or its penalty, as is the case here, weighs importantly. Thus the existence of the required "debt" is questionable. However, the Court has decided to also deal with the nondischargeability issue because the proceeding has been presented to the Court in that posture.

5

## II. Marriage and Vicarious Liability under § 523

A Bankruptcy Court in this District recently stated:

> With respect to plaintiffs' claim under § 523(a)(2)(A), actual fraud, that there was a husband and wife relationship in and of itself is insufficient to warrant the imputation of a spouse's fraud to the other spouse. In re Carro, 210 B.R. 13 (Bankr. D.P.R. 1997). The cases we have found in which such imputation is discussed, and where one spouse is held liable for the acts of the other, involve a legal relationship in addition to the marriage. In re Smith, 98 B.R. 423 (Bankr. C.D. Ill.1989) (holding wife's debt nondischargeable because wife deemed to be an agent of husband); In re Surls, 240 B.R. 899 (Bankr. W.D. Mo.1999)(holding wife liable for husband and his corporation's debt under the alter ego theory). In the absence of a relationship additional to the marriage, plaintiffs must show that defendant himself is liable pursuant to the usual requirements to make out a fraud nondischargeability case[.]

In re Ostling, 266 B.R. 661, 665 (Bankr. E.D. Mich. 2001)(also denying liability under § 523(a)(4) and (a)(6))(aff'd sub nom. Myers v. Ostling, 284 B.R. 614 (E.D. Mich. 2002)).

Other courts have supported that view.

> [T]he spousal relationship does not automatically impose vicarious liability on one spouse for the wrongful acts of the other: something more is needed. See Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515, 518 (9th Cir. BAP 2002)("[A] marital union alone, without a finding of a partnership or other agency relationship between spouses, cannot serve as a basis for imputing fraud from one spouse to the other.)"

In re Budnick, 469 B.R. 158, 171 (Bankr. D. Conn. 2012); In re Gauthier, 349 Fed. Appx. 943, 945-46 (5th Cir. 2009); Agribank v. Gordon (In re Gordon), 293 B.R. 817, 823 (Bankr. M.D. Ga. 2003).

A debtor can be held liable for a spouse's fraudulent misuse of a power of attorney. See In re Tyson, 450 B.R. 514, 521 n. 11 (Bankr. E.D. Pa. 2011). Vicarious liability can be imposed on a spouse under the theories of partnership, agency, or civil conspiracy. In re Budnick, 469 B.R. at 171. Under governing Michigan law, a partnership is defined as "an association of 2 or more persons, which may consist of husband and wife, to carry on as co-owners a business for profit[.]

6

Mich. Comp. Laws Ann. § 449.6. "The term 'agency' includes every relation in which one person acts for or represents another by his or her authority. It is a voluntary relationship that is dependent on the mutual consent of the parties." 1 Mich. Civ. Jur., Agency § 4 (footnotes omitted). The essential elements of a civil conspiracy are "(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means. A claim of civil conspiracy must be based on an underlying actionable tort." Kasey, Inc. v. Alpine Realty Now, Inc., 2012 WL 10998 (Mich. App. 2012)(citations omitted).

### III. Mr. Anton's Liability

Plaintiff argues that the both Defendants should be held jointly and severally liable on all three asserted nondischargeability counts. Mr. Anton can be held liable for the nondischargeable debt only if either (a) his wife's liability under § 523(a)(4) can be vicariously imputed to him under the theories of partnership, agency, or civil conspiracy or (b) his own conduct with regard to the Scheme indicates that he should be otherwise liable under one of the three nondischargeability counts. In either case, the following questions will be determinative. What benefit, if any, did Mr. Anton obtain from the Scheme? What involvement, if any, did Mr. Anton have in the Scheme? Did Mr. Anton know of the Scheme or, if not, should he have reasonably become suspicious of the source of the Debtors' income?

#### A. The Framework for Mr. Anton's Liability under § 523(a)(4)

This section states that a debtor shall not be discharged from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The relevant portion

7

of the order granting partial summary judgment for nondischargeability against Mrs. Anton states:

> IT IS HEREBY ORDERED that Plaintiffs' motion for partial summary judgment is granted, as to the issues of liability pertaining to Defendant Deborah Anton, only, based upon Defendant Deborah Anton having tendered a plea of guilty in the Lapeer County Circuit Court to the charge of Larceny (more than $200 and less than $1,000), thereby meeting the elements of 11 USC 523(a)(4). IT IS FURTHER ORDERED that there is no ruling by this Court as to the issues or amount of damages at this time.

Order Granting Partial Summary Judgment (Docket #47). It is Plaintiff's contention that liability under § 523(a)(4) should be imputed to Mr. Anton because of his knowledge of his wife's Scheme, which can be inferred from the circumstances, along with his benefit from it. The power of attorney over Ms. Gidelski's affairs was granted to Mrs. Anton and not to Mr. Anton, so Plaintiff cannot prove (and indeed does not argue) that Mr. Anton was acting in a fiduciary capacity. A nondischargeable obligation can still arise under this section if Plaintiff can prove embezzlement or larceny. In re Stollman, 404 B.R. 244, 271 (Bankr. E.D. Mich. 2009)(citing In re Noblit, 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005)). This may be proven either though Mr. Anton's vicarious liability or his own conduct. Embezzlement is defined as

> the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

Id. (quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172–73 (6th Cir.1996)).

Larceny is defined as

> the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner. Larceny for purposes of § 523(a)(4) requires proof that the debtor wrongfully and with fraudulent intent

took property from its rightful owner. As distinguished from embezzlement, the
original taking of the property must be unlawful.

In re Stollman, 404 B.R. at 271 (quoting General Motors Acceptance Corp. v. Cline, 2008 WL 2740777 (N.D. Ohio 2008)).

### B. The Framework for Mr. Anton's Liability under § 523(a)(2)

This section states that a debtor shall not be discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" To succeed on such a claim under this section, a creditor must establish that:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

In re Grenier, 458 Fed. Appx. 436, 438 (6th Cir. 2012)(quoting In re Rembert, 141 F.3d 277, 280-81 (6th Cir. 1998)) and must do so by a preponderance of the evidence. In re Rembert, 141 F.3d at 281.

### C. The Framework for Mr. Anton's Liability under § 523(a)(6)

This section states that a debtor shall not be discharged from any debt for willful and malicious injury to another. The terms "willful" and "malicious" are distinct and separate concepts. In re Martin, 321 B.R. 437, 440 (Bankr. N.D. Ohio 2004). The injury must have been both willful and intentional, not just the act giving rise to injury. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)(unanimously holding that injury from medical malpractice was not "willful and malicious" because it was only negligent or reckless). The term willful means a deliberate or

9

intentional injury. Id.; In re Little, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005). To establish that a defendant "willfully" injured it, a plaintiff must show that the defendant either acted with an actual intent to cause their alleged injury or a belief that the alleged injury was substantially certain to result from his act. See Phillips v. Weissert (In re Phillips), 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010)(citing Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 463 (6th Cir. 1999)). "The term malicious is defined as conduct taken in conscious disregard of one's duties or without just cause or excuse." In re Little, 335 B.R. at 383-84 (quoting Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986)).

## IV. Whether the Facts Support Mr. Anton's Liability

When analyzing the question of imputation of fraud to a spouse, courts have explored the totality of the circumstances, including the spouse's knowledge of the wrongful conduct, and the participation and benefit from it. "Even knowledge of a spouse's misconduct is insufficient to confer liability. Rather, knowledge must be concurrent with participation in the use or enjoyment of the stolen property in order for liability to attach." In re Magpusao, 265 B.R. 492, 498 (Bankr. M.D. Fla. 2001)(citing Haemonetics v. Dupre, 238 B.R. 224, 228 (D. Mass. 1999); Chicago Title Ins. Co. v. Mart (In re Mart), 75 B.R. 808, 810 (Bankr. S.D. Fla. 1987)). "In order for liability to attach, the person to whom intent is sought to be imputed must be aware of the spouse's misconduct and must participate in the use or enjoyment of the ill-gotten gains." In re Vasile, 297 B.R. 893, 902 (Bankr. M.D. Fla. 2003)(citation omitted). "The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud." Matter of Walker, 726 F.2d 452, 454 (8th Cir. 1984)(citations omitted). In In re Budnick, 469 B.R. 158, a husband who was

10

previously unaware of his wife's fraud with regard to their business, but later became aware of such, was held vicariously liable as an agent of the fraud perpetuated *after* he became aware.

Two particular cases illustrate the type of conduct that will render a spouse liable. In <u>In re Cottingham</u>, a husband was held liable for his wife's embezzlement due to the extent of his knowledge and his benefit from it. 473 B.R. 703 (B.A.P. 6th Cir. 2012)(affirming 2011 WL 2118247 (Bankr. E.D. Ky. 2011)). The husband was a construction superintendent, earning a gross income between $53,000 to $59,000. His wife embezzled nearly $1.2 million from her employer over a period of eight years, much of which went into the couple's joint bank account and was used to pay household expenses. The couple used this ill-gotten money to live lavishly and well beyond the means they could afford through their legitimate income. This included a vacation, major home renovations, a new pool, and new vehicles. The wife also stole household goods from her employer and used them to furnish the home. The husband signed paperwork, such as tax returns and loan documents, detailing their financial situation. The husband was also aware that his wife had previously participated in a similar embezzlement scheme, for which she was convicted and ordered to pay restitution (interestingly, she paid restitution with money she wrongfully obtained from the subsequent embezzlement scheme). The Bankruptcy Court correctly found that the husband must have known of the embezzlement and could not claim ignorance for the money his wife was embezzling and from which he benefitted.

> Specifically, the bankruptcy court considered "(1) the significant disparity between the Debtors' income and expenses, a disparity that continued to increase over the course of the embezzlement; (2) [the husband's] access to and participation in the family's finances; (3) the cost of the home improvements; and (4) [the husband's] knowledge that [the wife] had recently pled guilty to embezzling funds from her prior employer." The court concluded, "[the husband] cannot conveniently stick his head in the sand and say that he did not have knowledge of [the wife's] activities until the day she admitted her guilt. His

11

proffered ignorance is not credible." "He was an active participant in the conversion of the stolen funds and property."

In re Cottingham, 473 B.R. at 709 (quoting and affirming the Bankruptcy Court).

Similarly, in In re Magpusao, 265 B.R. 492, the Bankruptcy Court partially rejected a husband's purported ignorance of his wife's misappropriation of approximately $162,000 from her employer, and held him liable for the portion of which he was aware or should have been aware. The court noted that the husband was financially savvy, well acquainted with the family's finances (even able to recite the account number from an old bank account from memory), and well aware that that the family was spending well beyond its means. The husband benefitted from the misappropriation, as the family was able to afford multiple trips to the Philippines, a new car, credit card purchases, and allowances to their children. However, because the wife was a bookkeeper by trade, managed the family's finances almost exclusively (which was in accordance with their Filipino culture), and actively concealed the misappropriation from her husband out of fear he might kill her had he discovered it, the court refused to find that the husband was liable for the *full* amount of his wife's misappropriation.

> [T]he Court does find that [the husband] was aware that his wife was receiving money from an unexplained source, even though he did not actively solicit her ill-gotten gains. Instead, he accepted only those benefits that she herself conferred upon him. Based upon these findings, the Court cannot hold [the husband] liable for all of the embezzled funds that his wife deposited in the Joint Account. He can only be held accountable for items that he knew were acquired illegally and which he nevertheless accepted.

In re Magpusao, 265 B.R. at 500-01.

Mr. Anton did benefit from the Scheme. The improperly obtained funds were used to pay for his travel expenses, the children's private school education, general household expenses, and improvements to his home, which he and his wife owned as tenants by the entirety. Goods and

12

services that the couple would otherwise be unable to afford were purchased with these misappropriated funds.

Importantly however, the Court is persuaded by Mr. Anton's testimony that he had no knowledge of the Scheme until it began to unravel around August of 2008. Mr. Anton was often away from the household because of his frequent business travel. As a result, he and his wife reached the understanding that she would exclusively manage the Debtors' finances. The Court is persuaded that he placed genuine and sincere trust in his wife's financial management, such that he did not question the details of the Debtors' financial situation. Mrs. Anton testified that her husband may have signed only one check from the couple's accounts in a seven to nine year period. Although he could have had access to the Debtors' finances, particularly with regard to joint accounts, he was content to trust his wife's judgment and did so in good faith. Mr. Anton did not become aware of the couple's financial hardship until he was laid off from his employment. Further, he did not become aware of his wife's Scheme until it began to unravel when Plaintiff's wife and the police made him aware of it.

Plaintiff argues that Mr. Anton's claim of ignorance is insincere and disingenuous. In Plaintiff's view, Mr. Anton "must have known" of the Scheme due to the large sums of misappropriated money coming into his household. Plaintiff alleges that the Scheme increased the Antons' household income by around 45%. Plaintiff makes a strong argument by circumstantial evidence. However, this Court, having assessed the credibility of the witnesses and appropriately weighed the value of evidence, finds that Plaintiff has not met his burden of proving that Mr. Anton knew or should have known of the Scheme.

It is this Court's opinion that Mr. Anton did not "stick his head in the sand," but rather was genuinely and legitimately unaware of the Scheme. This was not a case of willful blindness,

13

which is defined as "[d]eliberate avoidance of knowledge of a crime, especially by failing to make a reasonable inquiry about suspected wrongdoing despite being aware that it is highly probable." Black's Law Dictionary (9th ed. 2009). Mr. Anton's lack of awareness of the Scheme is attributed to his extended absences from the household and his reliance on his wife's financial management, rather than any effort to remain willfully blind. While it may be argued that it would have been prudent for Mr. Anton to exercise some amount of oversight over his wife's financial management, he had no reason to suspect wrongdoing, nor to make an inquiry into the finances. Mr. Anton was employed as an engineer and earning an average of about $81,000 per year over a four year period. There was some disparity between his income and what the couple was spending, but it is not so great that it would raise such a high suspicion that would require him to inquire into the Debtors' finances, where it was his habit to defer to his wife's judgment. Would or should a person in Mr. Anton's situation wonder or ask questions about the source of the money? Maybe. But absent any duty to have done so or facts that amount to willful blindness, his not doing so cannot be used as a basis for either determining the existence of a debt or for nondischargeability, and such distinguishes this case from In re Cottingham and In re Magpusao.

Therefore, the Court is persuaded that Plaintiff did not meet his burden of proof for holding Mr. Anton liable, either vicariously for his wife's conduct, or by his own conduct. This lack of knowledge, together with the lack of duty to inquire further, strikes essential elements of each of the nondischargeability causes of action. Mr. Anton was neither Mrs. Anton's partner nor her agent in the Scheme. Nor did he engage in a concerted action or combination with his wife to achieve a common unlawful purpose, as would be required to hold him vicariously liable under civil conspiracy. He could not have committed embezzlement because he was never entrusted

14

with Ms. Gidelski's property as his wife was. He could not have committed larceny because, even though he benefited from the misappropriated funds, he had no actual or constructive knowledge that the funds were wrongfully obtained. Similarly, he cannot be liable for false pretenses, false representation, or actual fraud, neither was his conduct willful and malicious.

V. The Amount of Mrs. Anton's Nondischargeable Damages

Having previously decided Mrs. Anton's liability for a nondischargeable debt for the Scheme under § 523(a)(4), this Court must set an amount for damages. Plaintiff argues that the $200,000 sum ordered by the state court for restitution should be trebled, pursuant to a Michigan statute, which states:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws § 600.2919a. "[T]reble damages are permissive. Therefore, the trier of fact has the discretion to decide whether to award treble damages[.]" LMT Corp. v. Colonel, L.L.C., 2011 WL 1492589 (Mich. App. 2011)(citing Manuel v. Gill, 481 Mich. 637, 647 (2008)).

Therefore, it is within the Court's discretion to grant treble damages, attorney's fees, and costs. Under the statute, a court may treble the damages but it cannot grant some lesser amount

15

of additional damages, such as double damages. See <u>Poly Bond, Inc. v. Jen Tech Corp.</u>, 2010 WL 2925428 at *5 (Mich. Ct. App. 2010)("[O]nce the jury exercised its discretion to award treble damages under MCL 600.2919a, it could not award… an amount less than three times the actual damages suffered. Had the Legislature so intended, it would have provided that a person may recover *up to* three times the amount of actual damages sustained. Instead, the plain language of the statute provides that a person 'may recover 3 times the amount of actual damages sustained.'").

Trebling is not automatic, but rather, is left to the exercise of judicial discretion, which in this Court's view, involves a determination of what is fair under the circumstances. In considering whether to use that discretion, this Court notes that although Mrs. Anton clearly acted wrongfully over the course of years, she has expressed some remorse. The state court made a determination as to what debt Mrs. Anton ought to pay to society by way of incarceration, as well as to Ms. Gidelski by way of restitution. When the state court entered the restitution order, Ms. Gidelski was still alive and the restitution would have been paid to her. On the one hand, we have a substantial criminal restitution award incident to a conviction and a finding of nondischargeability. On the other hand, we have some expression of remorse, some incarceration resulting from the conviction, a nondischargeable amount that might take Mrs. Anton some years to pay, and the somewhat relevant fact that the beneficiary of the required payments will not be the actual victim, who is deceased, but rather the victim's heir. What is fair is what is just and equitable. In the Court's view, the totality of the recited circumstances tips the scale in favor of Mrs. Anton on the issue of treble damages, and the same applies to any award for attorney's fees and costs. Accordingly, the Court declines to exercise its discretion to grant such.

16

## CONCLUSION

For the foregoing reasons, this Court finds for Defendant David John Anton and denies Plaintiff's relief in this nondischargeability action against him. The amount of nondischargeable damages as to Defendant Deborah Anton is to be as the state court ordered, less any amounts already paid. Defendants shall present an appropriate order.

.

**Signed on April 12, 2013**

                                              **/s/ Walter Shapero**
                                      **Walter Shapero**
                                      **United States Bankruptcy Judge**